# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 8, 2021   Decided December 17, 2021

No. 20-1388

CALIFORNIA PUBLIC UTILITIES COMMISSION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CALIFORNIA INDEPENDENT SYSTEM OPERATOR CORPORATION,
INTERVENOR

———

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

———

*Candace J. Morey* argued the cause for petitioner. With her on the briefs were *Arocles Aguilar* and *Aaron R. Jacobs-Smith*.

*Elizabeth E. Rylander*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Matthew R. Christiansen,* General Counsel, and *Robert H. Solomon*, Solicitor,

*Ashley C. Parrish* was on the brief for *amicus curiae* Calpine Corporation in support of neither party.

Before: HENDERSON and KATSAS, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The Federal Energy Regulatory Commission (Commission) approved California Independent System Operator Corporation's (CAISO) proposed revision to the compensation structure for its Capacity Procurement Mechanism (CPM), a voluntary program designed to provide electric capacity necessary to maintain grid reliability within CAISO's network. The California Public Utilities Commission (CPUC), which participated in the Commission's proceeding, challenges the Commission's approval of CAISO's proposal. We grant the petition and remand with vacatur.

## I.  Background

The Federal Power Act, 16 U.S.C. §§ 791a *et seq.*, governs the transmission and wholesale marketing of electricity in interstate commerce and grants the Commission jurisdiction to regulate these activities in the public interest, *see id.* § 824(a), (b). Section 205 of the Act requires that "[a]ll rates and charges . . . by any public utility for or in connection with the transmission or sale of electric energy" must be "just and reasonable" and not "undu[ly] preferen[tial]." *Id.* § 824d(a), (b). A public utility seeking to change its rate structure must file the proposed changes with the Commission and bears "the burden of proof to show that the increased rate or charge is just and reasonable." *Id.* § 824d(d), (e). "When acting on a public utility's rate filing under section 205, the Commission undertakes 'an essentially passive and reactive role' and restricts itself to evaluating the confined proposal." *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 662 (D.C. Cir.

2017) (per curiam) (quoting *City of Winnfield v. FERC*, 744 F.2d 871, 875–76 (D.C. Cir. 1984)).

CAISO is the regional independent system operator that controls (but does not own) the transmission grid in California. *See generally Sac. Mun. Util. Dist. v. FERC*, 474 F.3d 797, 798–99 (D.C. Cir. 2007). In this role, CAISO has a responsibility to ensure sufficient independent generating resources—such as nuclear power plants, solar farms and natural-gas-fired power plants—are in place to meet California's present-day and future electricity demands. This is accomplished through the supply and purchase of electric "capacity," whereby a generating resource "commit[s] to produce electricity or forgo the consumption of electricity when required" by a load-serving entity—usually the public utility that delivers electricity to end users—creating "a kind of options contract" between the two parties. *Advanced Energy*, 860 F.3d at 659.

CAISO, working in conjunction with the CPUC, administers a resource adequacy program designed to ensure that there is sufficient electric generation in CAISO's markets to meet consumer demands under all but the most extreme conditions. The resource adequacy program requires utilities to procure enough capacity to meet their forecasted peak load plus a reserve margin set by the CPUC. Resource adequacy obligations are generally met through voluntary bilateral agreements between utilities and generating resources.

Backstop measures come into play if voluntary arrangements turn out to be insufficient to meet resource adequacy obligations. When CAISO determines that there is an unmet resource adequacy or reliability need, it may rely on its capacity procurement authority under the CPM provisions of its tariff to designate specific generating resources to provide

additional capacity. Generating resources seeking a CPM designation can enter into a competitive solicitation process. Entry into the CPM solicitation process is voluntary but if a resource submits a bid, and CAISO accepts the bid, the resource must accept the CPM designation. If CAISO unilaterally offers a CPM designation to a resource that did not participate in the solicitation process, that resource has the discretion to decline. The term of a CPM designation can range from a minimum of 30 days up to 12 months.

The central issue before us involves compensation under the CPM. When CAISO initially proposed the CPM program in 2010, it sought to compensate resources at a minimum price of $55 per kilowatt-year (kW-year), which was derived from the going-forward costs—defined as fixed operations and maintenance costs, ad valorem taxes and administrative costs, including insurance—of a reference resource plus a 10% adder.[1] A resource with costs above that price would have been permitted to submit a cost-justified bid to the Commission. The Commission declined to approve CAISO's proposal, citing concerns that the use of going-forward costs alone could "deny resources a reasonable opportunity to recover fixed costs" and that CAISO had not sufficiently explained "how the use of going-forward costs for CPM compensation will provide incentives or revenue sufficiency for resources to perform long-term maintenance or make [environmental] improvements." *Cal. Indep. Sys. Operator Corp.*, 134 FERC ¶ 61,211, ¶ 57 (2011) (hereinafter 2011 CPM Order). The Commission instructed its staff to convene a technical conference to address the Commission's concerns and discuss alternative compensation methodologies. *Id.* at ¶¶ 55, 58–59. In 2012, after the technical conference, CAISO proposed, and

---

[1] For the reference resource, CAISO used a 50 megawatt (MW) simple-cycle, gas-fired unit built by a merchant generator.

the Commission approved, a fixed CPM capacity price—subject to a four-year expiration date—of $67.50 per kW-year for two years, which increased by five per cent to $70.88 for the remaining two years. *See Cal. Indep. Sys. Operator Corp.*, 138 FERC ¶ 61,112, ¶¶ 10, 18–19 (2012).

In 2015, as the 2012 order was set to expire, CAISO proposed the now operative CPM compensation structure, which relies on competitive bidding. Under this structure, a resource can bid up to a "soft-offer cap" of a fixed-dollar amount—$6.31 per kW-month (or $75.68 per kW-year). The soft-offer cap is based on the going-forward costs of a reference resource plus a 20% adder.[2] CAISO reasoned that the 20% adder would allow resources with costs higher than the reference resource to recover their going-forward costs and additional fixed costs, as well as providing investment incentives. In the event that the soft-offer cap does not allow a resource to recover its going-forward costs, that resource can submit a cost-justified filing to the Commission for a higher rate. For these "above-cap" bids, CAISO proposed using the compensation formula applicable to Reliability Must-Run resources,[3] which compensates a resource for its full annual cost of service, including a return on and of capital. A Commission-approved, resource-specific CPM price remains in effect for the remainder of the calendar year, and for the subsequent two calendar years, unless superseded by a

[2] For the soft-offer cap, CAISO used a mid-cost, merchant-constructed, 550 MW combined cycle unit as the reference unit. This unit represents the largest percentage of non-resource adequacy resources eligible to receive CPM designations.

[3] The Reliability Must-Run program is a mandatory backstop program—characterized by CAISO as a "measure of last resort"—that authorizes CAISO to designate a generating resource to run that does not have a resource adequacy contract, thereby requiring it to provide capacity to meet reliability needs.

subsequent Commission-approved price during that period. In addition to their CPM compensation, all CPM resources, no matter whether they bid below or above the soft-offer cap, retain their market revenues. The Commission approved this compensation structure, finding that the soft-offer cap "should allow sufficient recovery of fixed costs plus return on capital to facilitate incremental upgrades and improvements by resources." *Cal. Indep. Sys. Operator Corp.*, 153 FERC ¶ 61,001, ¶ 29 (2015) (hereinafter 2015 CPM Order).

But in 2018, while CAISO sought approval for a related CPM tariff amendment, several interested parties—including the CPUC and CAISO's Department of Market Monitoring (DMM), its independent market monitor—raised concerns about whether *above-cap* CPM resources should be compensated for their full annual cost of service given they retain all market revenues. Rejecting CAISO's proposed amendment, the Commission "strongly encourage[d] CAISO and stakeholders" to "revisit[] the issue of the adequacy of CPM . . . compensation." *Cal. Indep. Sys. Operator Corp.*, 163 FERC ¶ 61,023, ¶ 48 (2018).

In February 2020, after conducting a two-year stakeholder review of the CPM process, CAISO filed a tariff amendment with the Commission reflecting two mutually exclusive proposals for compensating above-cap resources. The first option (Option A) would allow an above-cap resource to submit a cost-justified bid based on the resource's demonstrated going-forward costs plus a 20% adder. The second option (Option B) would provide the same going-forward cost recovery as Option A but without the adder. Under either option, an above-cap resource would still retain its market revenues. CAISO indicated that it favored Option A because it aligned with how the existing soft-offer cap is calculated and would be consistent with the Commission's

guidance—namely its 2011 and 2015 CPM Orders—that the CPM compensation scheme should include some meaningful fixed cost recovery beyond going-forward costs and provide incentives for resources to make upgrades and undertake long-term maintenance. Accordingly, CAISO requested that the Commission review Option B only if it did not accept Option A.

Numerous parties filed comments to CAISO's proposal, including the CPUC, DMM and Pacific Gas and Electric Company (PG&E). The CPUC and DMM argued that CAISO's proposal misapplied or misinterpreted earlier Commission orders regarding the soft-offer cap, the 20% adder and the need for recovery of fixed costs beyond going-forward costs. All three parties argued that CAISO failed to explain why a 20% adder was an appropriate level relative to the potential costs of long-term maintenance and environmental upgrades that would *not* be recovered under the rest of the CPM payment for going-forward costs plus the resource's market revenues.

In May 2020, the Commission approved Option A as just and reasonable and expressly declined to reach the merits of Option B. *See Cal. Indep. Sys. Operator Corp.*, 171 FERC ¶ 61,172, ¶ 35 & n.53 (2020) (hereinafter 2020 CPM Order). The Commission determined that Option A would allow participating resources "the opportunity for sufficient recovery of fixed costs plus a return on capital to facilitate incremental upgrades and improvement by the resources." *Id.* It further concluded that the inclusion of a 20% adder for above-cap, cost-justified bids was "consistent with Commission precedent on CPM compensation," citing its 2015 CPM order approving the soft-offer cap, which contained a 20% adder. *Id.* at ¶ 36. Then-Commissioner (now Chairman) Glick dissented from the Commission's order, concluding that CAISO failed to explain

why, in figuring an above-cap resource's going-forward costs, a 20% adder in addition to retained market revenues was just and reasonable. *Id.* (Glick, Comm'r, dissenting) at ¶¶ 4–5. Further, Commissioner Glick found reliance on the Commission's 2015 CPM order misplaced, as the 20% adder was included in the generic *soft-offer cap* to ensure that the cap covered comparable resources' going-forward costs, a consideration irrelevant under either Option A or B because an *above-cap* resource will recover its demonstrated going-forward costs. *Id.* (Glick, Comm'r, dissenting) at ¶ 6.

The CPUC requested rehearing. On July 30, 2020, in the absence of Commission action on the CPUC's request, the request was deemed denied by operation of law. *See Cal. Indep. Sys. Operator Corp.*, 172 FERC ¶ 62,052 (2020). The CPUC timely petitioned this Court for review.

## II.  Analysis

We have jurisdiction under the Federal Power Act, 16 U.S.C. § 825*l*(b). We review Commission orders under the familiar arbitrary and capricious standard and uphold the Commission's factual findings if they are supported by substantial evidence. *See West Deptford Energy, LLC v. FERC*, 766 F.3d 10, 17 (D.C. Cir. 2014); *see also* 5 U.S.C. § 706(2). To that end, the Commission "must be able to demonstrate that it has made a reasoned decision based upon substantial evidence in the record," *Del. Div. of Pub. Advoc. v. FERC*, 3 F.4th 461, 465 (D.C. Cir. 2021) (quoting *N. States Power Co. v. FERC*, 30 F.3d 177, 180 (D.C. Cir. 1994)), and "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315, 1319 (D.C. Cir. 2004) (alteration omitted) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983)). Although the Commission is afforded substantial deference in rate-related matters, as such matters "are either fairly technical or 'involve policy judgments that lie at the core of the regulatory mission,'" *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 55 (D.C. Cir. 2014) (per curiam) (quoting *Alcoa Inc. v. FERC*, 564 F.3d 1342, 1347 (D.C. Cir. 2009)), "it bears repeating that 'courts have never given regulators carte blanche,'" *Emera Me. v. FERC*, 854 F.3d 9, 22 (D.C. Cir. 2017) (quoting *Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511, 1514 (D.C. Cir. 1984)).

### A. Commission's Reliance on its 2015 CPM Order

In approving Option A, the Commission relied chiefly on its 2015 CPM Order approving the soft-offer cap, which includes a 20% adder. The Commission inferred from its 2015 order that applying the same adder to above-cap CPM bids would be just and reasonable:

> [T]he inclusion of a 20% adder on top of demonstrated going forward fixed costs is consistent with Commission precedent on CPM compensation. In 2015, the Commission accepted CAISO's currently effective soft offer cap, which is based on the going-forward costs of a reference unit plus a 20% adder, finding that this method for calculating the soft offer cap allowed for sufficient recovery of fixed costs plus a return on capital to facilitate incremental upgrades and improvement by resources. . . . Thus, the Commission has found that it is just and reasonable in the context of CPM compensation to allow resources the opportunity to recover costs beyond their going-

> forward costs and that a 20% adder is sufficient
> for this purpose.

2020 CPM Order, at ¶ 36. In the CPUC's view, the Commission's reliance on the 2015 CPM Order in this manner was not the product of reasoned decision-making. We agree.

As this Court has noted, "[t]here is no question that the Commission may attach precedential, and even controlling weight to principles developed in one proceeding and then apply them under appropriate circumstances in a stare decisis manner." *La. Intrastate Gas Corp. v. FERC*, 962 F.2d 37, 44 (D.C. Cir. 1992) (alteration in original) (quoting *Mich. Wis. Pipe Line Co. v. Fed. Power Comm'n*, 520 F.2d 84, 89 (D.C. Cir. 1975)). But application of precedent is warranted only if "the factual composition of the case to which the principle is being applied bear[s] something more than a modicum of similarity to the case from which the principle derives." *Id.* (alteration in original) (quoting *Mich. Wis. Pipe Line*, 520 F.2d at 89); *see also Me. Pub. Serv. Co. v. FERC*, 964 F.2d 5, 9 (D.C. Cir. 1992) (Commission's mere citation to an earlier order using particular percentage in rate calculation necessarily left Court "in the dark about why the Commission thought [that] percentage appropriate here").

Our recent decision in *Delaware Division of Public Advocate v. FERC*, 3 F.4th 461 (D.C. Cir. 2021), is instructive. There, the Commission approved the system operator's inclusion of an automatic 10% adder for energy market bids by resources in the same category as the reference resource—a combustion turbine plant. *Id.* at 464, 468–69. In approving the automatic adder, the Commission relied almost entirely on its earlier approval of an optional 10% adder for all bidding resources under the same program. *Id.* at 468–69. As we summarized, the Commission approved the automatic adder

because "the adder's general use was already approved as just and reasonable," *id.* at 469, and because the automatic adder made the formula for the reference resource "consistent with existing energy market rules," *id.* (quoting *PJM Interconnection, LLC*, 167 FERC ¶ 61,029, ¶ 128 (2019)). In light of substantial record evidence showing that the automatic adder "would run counter to a combustion turbine's economic interest," creating the distinct possibility that "no or few actual combustion turbine plants [would] ever use the 10% adder," we concluded that the Commission's mere citation to its earlier order—absent further explanation or analysis—was arbitrary and capricious. *Id.* at 469.

Here, as in *Delaware Division*, the Commission failed to grapple with the distinction between bids submitted below or above the soft-offer cap, resulting in the Commission's reliance on precedent "without recognition of the substantial differences between the two cases." *Mich. Wis. Pipe Line*, 520 F.2d at 89. Regarding the soft-offer cap, the 20% adder serves to provide cost recovery beyond going-forward costs, thereby allowing resources to undertake incremental improvements and upgrades. *See* 2015 CPM Order, at ¶ 29. But the adder also serves to facilitate bidding—up to the soft-offer cap—among resources with going-forward costs different from those of the reference resource. *Id.* at ¶ 13. As a result, a resource's recovery of additional fixed costs is necessarily constrained by the resource's relationship to the reference resource and the soft-offer cap itself: While a resource with going-forward costs at or below the reference resource can take full advantage of the 20% adder, a resource with going-forward costs above those of the reference resource but less than the soft-offer cap is not guaranteed the same opportunity for cost recovery.

The adder in Option A, by contrast, allows for additional cost recovery that is not so similarly constrained. Because a

resource compensated under Option A is guaranteed to recoup its demonstrated going-forward costs, any differences in cost recovery relative to the reference unit—a concern motivating the inclusion of the adder for below-cap resources—are rendered irrelevant. All above-cap resources will therefore be permitted to use the full 20% adder to finance incremental investments and upgrades, an opportunity not afforded to all below-cap resources. Further, because the adder is tied directly to a resource's going-forward costs and not limited by an offer cap, its inclusion effectively renders the compensation formula uncapped; the greater a facility's going-forward costs, the more it stands to recover through its cost-justified bid. This uncapped recovery stands in stark contrast to the soft-offer cap, which is meant to cap maximum bids evenly in order to facilitate competition among resources.

In short, the soft-offer cap produces a fixed, resource-agnostic maximum rate meant to facilitate a competitive bidding process among many resource classes but Option A results in a variable, resource-specific and uncapped maximum rate intended to compensate particular resources. Rather than discussing these material differences in deciding whether to approve the Option A adder, the Commission simply cited its 2015 CPM Order, invoking a sort of "consistency" rationale, and left it at that. *See* 2020 CPM Order, at ¶¶ 36–37. That simply will not do and does not evince the type of reasoned decision-making necessary to withstand scrutiny. *See Del. Div. of Pub. Advoc.*, 3 F.4th at 469 (rejecting Commission's conclusion that adder was just and reasonable simply because it was "consistent with existing energy market rules") (citation omitted); *see also State Farm*, 463 U.S. at 43 (finding agency action arbitrary and capricious if agency "failed to consider an important aspect of the problem").

## B. Lack of Substantial Evidence

Apart from the Commission's misplaced reliance on its 2015 CPM Order, the record contains no evidence or findings to support its decision. Like every agency, the Commission "must be able to demonstrate that it has made a reasoned decision based upon substantial evidence in the record." *Del. Div. of Pub. Advoc.*, 3 F.4th at 465 (quoting *N. States Power*, 30 F.3d at 180); *see also Emera Me.*, 854 F.3d at 28 ("FERC must adequately explain how the evidence it relied on 'support[ed] the conclusion it reached.'") (alteration in original) (quoting *Wis. Gas Co. v. FERC*, 770 F.2d 1144, 1156 (D.C. Cir. 1985)). We have construed the substantial evidence standard to require "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)), something "more than a scintilla" but "less than a preponderance of the evidence," *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002). Here, no matter how we formulate the substantial evidence standard, the Commission fails to meet its mandate.

Stripped of its citation to the 2015 CPM Order, the Commission's order has little else, if anything, to support it. Neither CAISO, in proposing Option A, nor the Commission, in approving Option A, relied on findings supporting its conclusion that a 20% adder for above-cap resources would be a just and reasonable mechanism to provide them "the opportunity for sufficient recovery of fixed costs plus a return on capital to facilitate incremental upgrades and improvement by the resources." 2020 CPM Order, at ¶ 35. For example, there are no findings on which cost categories resources should have the "opportunity" to recover, what amount of recovery for such costs would "facilitate" the desired incremental improvements

and upgrades or what relationship a fixed 20% adder—as opposed to a different adder or simply market revenues—bears to those identified cost categories or desired improvements and upgrades. *See id.* (Glick, Comm'r, dissenting), ¶ 4 ("[T]here is nothing in the record to support the Commission's finding that it is just and reasonable to allow resources that bid above the soft offer cap to recover 120 percent of the short-term fixed costs."); J.A. 067 (DMM arguing that "[t]he CAISO filing does not include any explanation or analysis of how or why a 20% adder is an appropriate level relative to potential costs of 'long term maintenance' and 'environmental upgrades'"). It is difficult for us to ascertain "a rational connection between the facts found and the choice made" when both the Commission and CAISO failed to establish the basic facts. *See State Farm*, 463 U.S. at 43 (citation omitted).

Moreover, several parties that participated in the Commission's proceeding pointed out the dearth of supporting evidence in the record but the Commission largely ignored them. *See TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015) ("It is well established that the Commission must 'respond meaningfully to the arguments raised before it.'") (quoting *Pub. Serv. Comm'n v. FERC*, 397 F.3d 1004, 1008 (D.C. Cir. 2005)). The CPUC, DMM and PG&E all noted the lack of analysis as to why market revenues alone—which are uncapped and not netted against other CPM compensation—would provide insufficient cost recovery for incremental upgrades and improvements, thereby necessitating a 20% adder. *See* J.A. 055–56 (CPUC Comments); J.A. 067–68 (DMM comments); J.A. 094–98 (PG&E Comments). Indeed, PG&E provided modeling indicating the significant likelihood that a facility's *full cost of service* would be recovered from going-forward costs and market revenues alone—*i.e.*, before the inclusion of any adder. J.A. 094–95. Yet, notwithstanding the Commission's acknowledgment of

the parties' arguments on this issue, 2020 CPM Order, at ¶¶ 12–14, it otherwise failed to address them, *see TransCanada*, 811 F.3d at 12 (faulting Commission because it "simply never addressed" petitioner's argument).[4]

Further, the CPUC and DMM raised concerns that the inclusion of a 20% adder that bears no clear relationship to particular cost categories or improvements could result in compensation for costs not incurred, rendering the rate potentially unjust or unreasonable. *See* J.A. 054–55 (CPUC Comments); J.A. 067 (DMM Comments). As a practical matter, the CPUC noted in its comments, a resource making a cost-justified bid "should know what long-term upgrades and maintenance and other capital investments should be expected in the coming year," making a fixed adder for yet uncertain costs inappropriate and potentially excessive. J.A. 054–55. As this Court has often noted, "rates that permit excessive profits are not just and reasonable." *TransCanada*, 811 F.3d at 12.[5] To

---

[4] The Commission has previously indicated that compensation in voluntary backstop programs "must at a minimum allow for the recovery of the generator's going-forward costs, with parties having the flexibility to negotiate a cost-based rate *up to the generator's full cost of service*." *See New York Indep. Sys. Operator, Inc.*, 155 FERC ¶ 61,076, ¶ 100 (2016) (emphasis added) (quoting *New York Indep. Sys. Operator, Inc.*, 150 FERC ¶ 61,116, ¶ 17 (2015)). If the 20% adder would push above-cap compensation beyond full cost of service—as some parties argue is the case—the Commission's lack of engagement is troubling.

[5] On appeal, the Commission argues that it will ensure that a resource making a cost-justified filing has sufficiently demonstrated its asserted going-forward costs and that its filing is otherwise just and reasonable. But the Commission's discretion is not as expansive as it makes it seem. Under Option A, which is set out in CAISO's tariff, a resource is entitled to the 20% adder without any showing of additional need. The Commission's review is accordingly limited to whether (1) the resource's asserted costs fall within the three

the extent that the Commission discussed this argument, it characterized the argument as "unpersuasive" because the Commission did not deem it "strictly necessary to include an accurate estimate of" costs beyond going-forward costs in its 2015 CPM Order. 2020 CPM Order, at ¶ 38. But this response largely skirts the question of excessive compensation or lack of supporting evidence as simply a quibble over accuracy. *See TransCanada*, 811 F.3d at 12 (dismissing Commission argument as "specious because it does not address the valid concern raised by" party). Further, it misapplies the 2015 CPM Order: The fact that the Commission did not require CAISO to document which cost categories the adder was meant to compensate for a resource-agnostic soft-offer cap meant to cover many resource classes does not necessarily mean that such a showing is not needed for individualized, cost-justified filings.

Rather than responding to the parties' comments and marshalling supporting evidence, the Commission elected instead to repeat the phrase "the opportunity for sufficient recovery," 2020 CPM Order, at ¶ 35, as a sort of "talismanic phrase that does not advance reasoned decision making," *TransCanada*, 811 F.3d at 13; *see also New England Power Generators Ass'n, Inc. v. FERC*, 881 F.3d 202, 211 (D.C. Cir. 2018) (Commission cannot satisfy its mandate to engage with parties' comments by relying on "conclusory statements that dismissed [a party's] concerns without providing reasoned analysis").

---

categories comprising going-forward costs and (2) the CPM price was properly calculated using the approved formula—*i.e.*, Option A. The Commission therefore offers only a tautology: Its review will ensure the generator's offer is just and reasonable, assuming that the above-cap formula itself is just and reasonable.

For the foregoing reasons, the petition for review is granted. We therefore vacate the Commission's order and remand the case for proceedings consistent with this opinion.

*So ordered*.